IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | | |
|---|---|---|
| Delano Scott, | ) | C.A. No. 5:07-3571-MBS-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **DEFENDANT'S MOTION FOR** |
| County of Orangeburg, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Statement of the Case

This case involves claims of employment discrimination brought by Plaintiff Delano Scott ("Scott") against his employer, the County of Orangeburg, South Carolina ("the County"). Scott, who is employed by the County as a commercial plans examiner in the Building Inspection Department, alleges that the County refused to promote him to the positions of Facilities/Construction Manager and Building Official in 2006 because of his race, African-American. He also alleges that he was denied the Building Official position because he filed a charge of discrimination over his nonselection to the Facilities/Construction Manager position. Scott purports to state claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.* In addition to these federal claims, he purports to state a pendent claim for breach of contract, contending that the County violated a policy found in its personnel ordinance when it hired as its Building Official an applicant not then employed by the County.

Discovery has closed, and the County has moved for summary judgment. This memorandum is in support of that motion.

Statement Facts

Scott has been employed by the County as a commercial plans reviewer in the Building Inspection Department since 1998. He was hire by the County Building Official "Butch" Fogle. [P.dep. 30-33] In 2003, Scott was suspended for five days by County Administrator Bill Clark for altering a temporary Certificate of Occupancy that had been issued by Mr. Fogle in his official capacity as County Building Official. This misconduct was discovered when an employee found a copy of an altered certificate of occupancy in the copier and traced it back to Scott. [Clark dep. 59-65 and D.Exs. 1-4] Scott admitted that he had attempted to alter or copy the Certificate of Occupancy issued by Mr. Fogle but claims he never altered the original document. [P.dep. 71-75]

In 2006, Orangeburg County Council authorized a new position to oversee County building construction and renovation projects and maintenance of County-owned facilities. These duties had previously been assigned to Deputy Administrator Earl Whalen, but the number of projects underway and in the pipeline had become so numerous and overnight so time-consuming that County Administrator Clark requested, and Council approved, the position of Facilities/Construction Manager as part of its Fiscal Year 2007 budget, which began July 1, 2006. [Clark dep. 23-24; 70-73; D.Ex. 5]

The position was advertised, and several County employees applied, including Scott, Fogle, Reggie Brewer (an inspector in the Building Inspection Department), and Delbert Horst, an electrician in the Building Maintenance Department. [P.dep. 56, 81-82; Clark dep. P.Ex. 3] Since the F/CM would report to Deputy Administrator Whalen, he was assigned to review the applications and select the candidate he thought best qualified for the position. [Clark dep. 65] Mr. Whalen knew Fogle from having attended department head/executive staff meetings with him for many years and was familiar with his background in construction in the private and public sector and his

2

reputation among contractors.  Mr. Whalen selected Fogle based on his assessment that he would be the best qualified of the candidates to perform the duties of the job that he had previously been responsible for doing.  [Whalen aff.]

County Administrator Clark approved Mr. Whalen's selection and Fogle assumed his new duties on September 4, 2006.  [Clark dep. 65-75, 79-81, P.Ex. 2]  Fogle's move to the F/CM position created a vacancy in his former position as Building Official and a need to provide for management of the Building Inspection Department on an interim basis until that vacancy could be posted and filled.  Accordingly, Mr. Clark and Deputy Administrator Harold Young met with Scott and Harry Wiggins, an inspector who was certified as a building official by the International Code Council, at the end of August to inform them that Fogle had been selected as thee F/CM, that his former position would be advertised and they were welcome to apply, and that they would be responsible for managing the Building Inspection Department in the meantime.  [P.dep. 58; Clark dep. 75-76]  Both Wiggins and Scott reacted badly to this news, Wiggins by touting his alleged superior qualifications and certifications, and Scott by claiming that he was insulted that Young and Clark would even consider Wiggins to be a viable competitor to him for the position and insisting that he would not work for Wiggins if he were selected.  [P.dep. 58-71; Clark dep. 81-83; Young dep. 31-37]

The Building Official position was advertised beginning on September 8, 2006, and generated applications from Scott and Wiggins as well as several applicants employed by other counties and municipalities.  Deputy Administrator Young determined that in light of the obvious friction between Wiggins and Scott and their behavior at the late-August meeting they had with Mr. Clark and him, an outside candidate could more effectively lead the department.  He selected Bruce Spicher, a certified building official then employed by Charleston County as a supervisory senior inspector, and Mr. Clark approved the selection.  [Young dep. 37-44; Clark dep. 42-43, 50]

On October 12, 2006, Scott filed a charge of discrimination with the Equal Employment Opportunity Commission alleging that he was not selected for the F/CM position because of his race. [P.dep. D.Ex. 7] This is the only charge of discrimination that he ever filed against the County. [*Id.* 25-29] On July 30, 3007, the EEOC issued a Dismissal and Right-to-Sue notice, ruling that Scott's claim was not factually supported. [*Id.* D.Ex. 9]

Additional facts are set forth in Argument.

<u>Argument</u>

1.    <u>Scott's claim that he was denied promotion to the position of Facilities/Construction Manager because of his race fails as a matter of law on the undisputed material facts.</u>

In his first cause of action, Scott alleges that he was denied promotion to the newly-created position of Facilities/Construction Manager (sometimes hereafter referred to as "F/CM") because of his race. This position, which was authorized by County Council as part of the fiscal year 2007 budget (beginning July 1, 2006), was created to enable the County to better oversee and manage several significant capital construction and renovation projects, including construction of a Ten Million Dollar aquatic facility, construction of a new animal shelter, and renovation of the County Courthouse. [Clark dep. 23-24, 70-73, D. Ex. 5] The position was posted and advertised beginning on July 20, 2006. [P.dep. D.Ex. 3] There were eight applicants for the position, including Orangeburg County Building Official William "Butch" Fogle and two of his subordinates, Scott and Reggie Brewer. [P.dep. 56, 81-82; Clark dep. P. Ex. 3] In accordance with County policy, Deputy County Administrator Earl Whalen, to whom the F/CM reports, reviewed the applications, made his selection and forwarded his selection to the County Administrator for final approval. Mr. Whalen recommended Mr. Fogle for the position, and the County Administrator approved the recommendation. Accordingly, Fogle assumed the position of Facilities/Construction Manager effective September 4, 2006. [P. dep. 58-60; Clark dep. 13-17, 25-28, 65, 73-76, 79-80, P.Ex. 2;

Whalen aff.]  Scott's claim that he was not selected for this position because of his race is not supported by the evidence of record and, indeed, is refuted by his insistence that this position was created specifically for Fogle and that Fogle was preselected to fill the position.

The posted vacancy announcement described the duties of the Facilities/Construction Manager position as follows:

> Coordinates construction and renovation activities related to county building projects with architects, engineers, and contractors.  Provides on-site observation during construction/renovation projects, resolves conflicts as needed.  Inspects all county buildings/facilities on a scheduled basis to identify maintenance and/or public safety needs.  [R]eports to the Deputy Administrator for Public Works.

[P.dep. D.Ex. 3]  The announcement also set out the minimum qualifications for the position:

> Associate's degree (A.A.) or equivalent from a two-year college or technical school in engineering and a minimum of three to five years of experience in the field of building construction in a supervisory capacity.  The individual selected will have the ability to apply common sense understanding, judgment and the capacity to make sound and reasonable decisions.  Must possess a valid SC driver's license.

[*Id.*]

Scott, who has a bachelor's degree in civil engineering technology, had been employed by the County since 1998 as a commercial plans examiner, a nonsupervisory position in the Building Inspection Department.  [P.dep. 6, 32, 34-35, 51]  Although he supervised the construction of an employee parking lot at Hartsfield International Airport in Atlanta in the late 1970s while employed with William Russell & Associates, his work history does not include "three to five years of experience in the field of *building construction in a supervisory capacity*."  [P.dep. 10-23, 30, 51; Clark dep. 32-37; Boyd dep. 52-54]

Fogle, who had served as the County's Building Official since 1996, has an associates's degree in engineering graphics and mechanical engineering.  In his capacity as the Building Official,

Fogle supervised the Building Inspection Department and its staff. Prior to joining the County, Fogle had worked in commercial building construction and sales for more than fifteen years where he had supervised construction crews for Morton Builders and later Hoover Builders. He had also served as construction advisor and Building Official for the City of Orangeburg for five years before resigning to go to work with Morton Builders. [Clark dep. 66-67; Fogle aff.]

Mr. Whalen had been responsible for overseeing County construction and renovation projects incident to his duties as Deputy Administrator for Public Works prior to Council's authorizing this new position. He knew Mr. Fogle from executive staff/department head meetings that both attended and believed that Fogle was best qualified by reason of his background, character and experience to fill the newly created position. Not only did Fogle have the building construction and supervisory experience specified in the vacancy announcement but he had worked well with builders and contractors and, unlike Scott, had not been disciplined for misconduct reflecting adversely on his honesty, trustworthiness and/or integrity. Therefore, Mr. Whalen selected Fogle and submitted his name for approval to County Administrator Bill Clark. [Whalen aff.] Clark agreed with and approved Whalen's selection. [Clark dep. 79-81]

To establish his claim of racial discrimination with respect to the Facilities/Construction Manager position, Scott has to prove that he was not selected for this position because of his race. *See* 42 U.S.C. § 2000e - 2(a). He may satisfy his burden of proof through direct, indirect and/or circumstantial evidence. Regardless of the form of his proof, he must do more than show that he is black and was not selected for "unfair" reasons. *See Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384, 1386 (4th Cir. 1987); *Holder v. City of Raleigh*, 867 F.2d 823, 827-28 (4th Cir. 1989) (explaining that Title VII does not presume that adverse employment action is racially motivated merely because "victim" of adverse action is African-American and does not prohibit

6

"unfair" employment decisions, as such). Specifically, Scott must produce evidence of a causal link between his race and his nonselection for the F/CM position he sought. *See id*; *see also Hill v. Lockheed Martin Logistics Mgmt, Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (*en banc*) (plaintiff in disparate treatment case under Title VII "must produce sufficient evidence upon which one could find that the protected trait . . . actually motivated the employer's decision.") To withstand summary judgment, Scott must forecast evidence sufficient to support a rational finding that his race "actually played a role in [the County's] decisionmaking process *and* had a determinative influence on the outcome." *Id.* (emphasis added).

At his deposition, Scott conceded that he had no direct evidence to support his claim that he was denied promotion to the F/CM position because of his race. [P.dep. 119] In the absence of such evidence, he may rely on the shifting-burdens circumstantial proof framework first articulated by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Hux v. City of Newport News*, 451 F.3d 311, 314-15 (4th Cir. 2006); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). Under *McDonnell Douglas* and its progeny[1],

> the plaintiff-employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If []he succeeds, the defendant-employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against h[im].

*Evans v. Technology Applications & Service Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (internal quotations and citations and end citations omitted). If a plaintiff proceeding under the *McDonnell*

---

[1]*See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).

*Douglas* proof scheme fails either to make out a prima facie case of discrimination or to offer evidence that would support a reasonable inference that a proffered facially nondiscriminatory reason for the challenged adverse action is a pretext for unlawful discrimination, the defendant is entitled to summary judgment. *See Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993); *Hawkins*, 203 F.3d at 278-79; *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).

a.       Scott cannot establish a prima facie case of race discrimination.

To establish a prima facie case of race discrimination in the context of a failure to be selected for promotion, a plaintiff "must show by a preponderance of the evidence that (1) []he is a member of a protected class; (2) h[is] employer had an open position for which []he applied or sought to apply; (3) []he was qualified for the position; and []he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Evans*, 80 F.3d at 959-60. With respect to the element of qualifications, the Fourth Circuit has made clear that "[t]he employer has the right to fix the qualifications that are necessary or preferred in selecting the employee for promotion, *and*, in order to make out a prima facie case, a plaintiff must establish that []he meets these qualifications." *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d at 633, 671 (4th Cir.) (emphasis added), *rev'd in part on unrelated grounds sub nom. Cooper v. Federal Reserve Bank of Richmond*, 464 U.S. 932 (1983).  Thus, a Title VII plaintiff "cannot establish h[is] own criteria for judging h[is] qualifications for the promotion [but] must compete on the qualifications established by h[is] employer." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir.), *cert. denied* 546 U.S. 1214 (2006).

As previously noted, the Facilities/Construction Manager job posting specified "a minimum of three to five years of experience in the field of *building construction in a supervisory capacity*[]"

as one of the qualifications for the position.  [P.dep. D.Ex. 3 (emphasis added)]  The reason for this requirement, as the County Administrator explained, was that the County was "seeking . . . an individual whose depth of experience was such that he could manage a job site and manage contractors."  [Clark dep. 34-35]  Scott's deposition testimony and resumé reflect that he had experience working on highway and mass transit projects and that he had supervised a large parking lot construction project, but do not reflect any *supervisory* experience in the field of *building construction*.  [P.dep. 10-23, 30, 51, and D.Ex. 4; Clark dep. 32-37; Boyd dep. 52-54]  Fogle, in contrast, had supervised building construction projects both as construction advisor for the City of Orangeburg and while working in the private sector for Morton Builders and Hoover Builders. [Fogle aff.; Whalen aff.]

Since Scott lacked one of the prescribed qualifications for the position, he cannot establish a prima facie case of racial discrimination relating to his nonselection for the Facilities/Construction Manager position.  *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 230-31 (4th Cir. 1999) (*en banc*), *abrogated in part on unrelated grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Sutton v. Cree*, 386 F.Supp.2d 600, 605-07 (M.D.N.C.), *aff'd*, 172 Fed.Appx. 485 (4th Cir. 2006). Therefore, the County is entitled to summary judgment on this claim.  *See id.*; *see also Mitchell v. Data General Corp.*, 12 F.3d at 1315 -16.

b.    Even if he could establish a prima facie case of discrimination, Scott cannot make the showing of pretext required to withstand summary judgment.

(1)

Even if he could make out a prima facie case of discrimination, Scott cannot demonstrate that the reason given for Fogle's selection -- that the County considered him best qualified for the F/CM position [Whalen aff.; Clark dep. 79-81] -- was a pretext for race discrimination.  Scott asserts that he was more qualified than Fogle because he has a four-year college degree, whereas Fogle only has

a two-year degree. But, as the Fourth Circuit has consistently held, it is the employer's prerogative to establish the qualifications for a position, and a Title VII plaintiff attempting to prove pretext by showing that he was the better qualified candidate must show that he was better qualified with respect to those qualifications that the *employer* deems important. *See EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d at 671; *Anderson*, 406 F.3d at 269-71; *see also Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). Therefore, the mere fact that Scott has a four-year degree while Fogle has a two-year degree does not, as Scott seems to think, compel the conclusion that he was more qualified for the position. *See, e.g., Anderson*, 406 F.3d at 269-70. As former Chief Judge Anderson has observed, "Nothing in Title VII requires an employer to promote the applicant with the most years of formal education or the most advanced degree." *Jackson v. South Carolina Dep't of Highways & Public Transp'n*, 1991 WL 71761, *5 (D.S.C. 1991) (copy attached); *accord*, *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995); *Bryant v. Wynne*, 2008 WL 4361242, *14-15 (D.S.C. 2008) (copy attached).

Further, Scott's own assertions of his superior qualifications are not sufficient to demonstrate that he was the better qualified candidate for the position. See *Evans*, 80 F.3d at 960-62; *see also Vaughn v. MetraHealth Cos., Inc.*, 145 F.3d 197, 202 (4th Cir. 1998) ("Standing alone, self-serving claims of superiority do not suffice."), *abrogated in part on unrelated grounds by Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). Indeed, the Fourth Circuit has repeatedly emphasized that a plaintiff's own self-interested assessment of his qualifications for a particular position is irrelevant, as it is the decision-maker's assessment that matters. *See, e.g., Evans*, 80 F.3d at 960-61.

In sum, the fact that Scott has a four-year degree while Fogle has a two-year degree is insufficient in and of itself to establish that Scott was better qualified and, therefore, insufficient to

support a finding that the County's explanation for choosing Fogle was a pretext for race discrimination. *See Hux*, 451 F.3d at 315 (Title VII plaintiff cannot show pretext "simply [by] compar[ing] herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination.")  Since Scott has offered nothing other than his own self-interested opinions to support his claim of superior qualifications and has offered no other evidence that would undermine the credibility of the reasons given by the County for selecting Fogle for the F/CM position, his claim of race discrimination cannot withstand summary judgment.

(2)

Finally, Scott's claim that he was denied promotion to F/CM because of his race cannot withstand summary judgment based solely on his own account of the facts.  Scott testified that the F/CM position was created specifically for Mr. Fogle and that no one else was even seriously considered.  In other words, Scott contends that Fogle was preselected for the position from the outset.  [P.dep. 51-56, 75, 144-45; Plaintiff's Answers to Defendant's Interrogatories, no. 19] Preselection of a candidate, though, does not violate Title VII absent proof -- and there is none here -- that the preselection itself was racially motivated.

As the Fourth Circuit explained in *Anderson*, evidence that a supervisor may have preselected an employee for promotion is not sufficient for jurors to conclude that the employer's explanation for its decision is a pretext for race discrimination.  *Anderson*, 406 F.3d at 271.  Preselection of a particular person for a position is not probative of discriminatory intent because preselection "work[s] to the detriment of all applicants for the job, black and white alike." *Blue v. Dep't of the*

11

*Army*, 914 F.2d 525, 541 (4ᵗʰ Cir. 1990).[2]  So, "while preselection may establish that an employee was unfairly treated, it does not by itself prove racial discrimination." *Anderson*, 406 F.3d at 271 (internal quotations and end citation omitted).  In short, even if Scott could prove that Fogle was preselected for the F/CM position, such proof would not support a finding, or a rational inference, that the real reason that he (Scott) was not selected was his race.  *See Anderson*, *Blue*, *supra*; *see also Mackey v. Shalala*, 360 F.3d 463, 468-69 (4ᵗʰ Cir. 2004) (even if female plaintiff's allegations that male was preselected for position were true, preselection "is not sufficient evidence for jurors reasonably to conclude that [employer's] nondiscriminatory explanation for [male's] hiring was pretext [for sex discrimination]."); *Sherman v. Westinghouse Savannah River Co.*, 263 Fed.Appx. 357, 369 (4ᵗʰ Cir. 2008) (evidence that successful white applicant was preselected before job opening was even posted insufficient to demonstrate that proffered nondiscriminatory reason was pretext for race discrimination).

Preselection in and of itself, thus, neither violates Title VII nor is it probative of racial discrimination prohibited by Title VII.  Although Scott contends that Fogle was preselected for the position because of his race [Plaintiff's Ans. to Defendant's Interrogs., no. 20], he has identified no evidence to support this contention.  [*Id.*, no. 21][3]  Accordingly, his allegation that Fogle was preselected, even if true, is insufficient to support a finding that the reason given for Fogle's selection is a pretext *for racial discrimination*.  *See Jackson v. Winter*, 497 F.Supp.2d 759, 770

---

[2]Indeed, in this case, Reggie Brewer, a white inspector in the Building Inspection Department, was an applicant for the F/CM position along with Scott and Fogle. [P.dep. 56, 81-82; Whalen aff.]  If, as Scott maintains, Fogle was preselected for the position, that preselection disadvantaged Brewer just as it disadvantaged Scott.

[3]Not only does Scott not offer any evidence that Fogle was preselected because of race, his own testimony suggests that Fogle's friendship with County Administrator Bill Clark is what prompted the County to create the F/CM job especially for Fogle. [P.dep. 52-53]

(E.D.Va. 2007); *Scott v. Leavitt*, 2007 WL 2156421, * 5 (D.Md. 2007) (copy attached).  Hence, the

County is entitled to judgment as a matter of law.[4]

2.    Scott's claims that he was not selected for promotion to the Building Official position
      because of his race and/or because he had filed a charge over his nonselection for the
      Facilities/Construction Manager position are procedurally barred by his failure to file a
      charge of discrimination with respect to that discrete act.

In addition to challenging his nonselection for the F/CM position, Scott also challenges his

nonselection for promotion to the Building Official position that came open in September 2006 when

Fogle -- who had served in that position for ten years -- was named Facilities/Construction Manager.

He claims that the County's selection of Bruce Spicher instead of him to fill the Building Official

vacancy constituted race discrimination and was "in direct retaliation for his filing of a complaint

with the U.S. EEOC office in October."  [Complaint, ¶¶ 15, 21 and 27]  Scott, however, never filed

a charge with the EEOC about not being selected for the Building Official position.[5]  Therefore, his

claim that he was not selected for promotion to that job because of his race and/or his filing a charge

---

[4]It is well established that where a plaintiff's own testimony is that the adverse employment decision at issue was motivated by a non-merit based reason that is not prohibited by Title VII -- such as friendship, nepotism, or romantic relationship -- the employer is entitled to judgment as a matter of law on the Title VII claim.  *See, e.g.*, *Becerra v. Dalton*, 94 F.3d 145, 149-50 (4th Cir. 1996) (assuming that commanding officer promoted female employee not because she was most qualified but because she was engaged in sexual relationship with him, as male plaintiff claimed, preference for paramour did not violate plaintiff's rights under Title VII); *Neal v. Roche*, 349 F.3d 1246 (10th Cir. 2003) (black plaintiff's testimony that decision to lay her off instead of white employee was motivated by supervisor's friendship with white employee defeated her Title VII claim of race discrimination); *see also Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384 (4th Cir. 1987) (assuming that promotion of white employee rather than black plaintiff was based on selecting official's friendship with promoted employee, no violation of Title VII); *Jamil v. Secretary, Dep't of Defense*, 910 F.2d 1203, 1207 (4th Cir. 1990) (if discharge was motivated by plaintiff's whistleblowing about mismanagement and cronyism as he maintained, Title VII retaliatory discharge claim failed as matter of law because Title VII does not prohibit retaliation for complaining about such).

[5]Scott testified that the only charge of discrimination that he filed against Orangeburg County was the one filed in October 2006.  [P.dep. 25-29; 79-80; D. Ex. 7]

of discrimination are procedurally barred under the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

In *Morgan*, the Supreme Court was explicit that a party who seeks to litigate a discrete act of discrimination or retaliation under Title VII must "file a charge within 180 or 300 days of the act[.]" 536 U.S. at 110. If he does not do so, he "lose[s] the ability to recover for it." *Id. Morgan* made clear that if the charge-filing requirement is not satisfied with respect to each particular discrete discriminatory or retaliatory act, that act will not be actionable under Title VII "even when [it is] related to acts alleged in timely filed charges." *Id.*, 536 U.S. at 113. The Court reiterated this very point last year in *Ledbetter v. Goodyear Tire & Rubber Co.*, __ U.S. __, 127 S.Ct. 2162 (2007): "*Morgan* is perfectly clear that when an employee alleges . . . a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation." *Id.*, __ U.S. at __, 127 S.Ct. at 2175, *citing Morgan*, 536 U.S. at 113.

The failure to promote an employee to a position because of his race is, as *Morgan* itself recognizes, a discrete act of discrimination. *See id.*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'") Consequently, an employee who seeks to litigate a claim under Title VII that he was not promoted to a particular position because of his race must have filed a charge of discrimination with respect to that particular promotion. *Ledbetter*, 127 S.Ct. at 2175.

As the Tenth Circuit has explained, *Morgan*

> has effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions. * * * [U]nexhausted claims involving discrete employment actions are no longer viable. *Morgan* abrogates the continuing violation doctrine as

14

previously applied to claims of discriminatory or retaliatory actions by employers and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted. * * * In *Morgan*, this rule applied to bar a plaintiff from suing on claims for which no administrative remedy had been sought, when those incidents occurred more than 300 days *prior* to the filing of plaintiff's EEO complaint. The rule is equally applicable, however, to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint. * * *

\* \* \*

. . . [T]he rule in Morgan requires a Title VII plaintiff to exhaust administrative remedies for each individual discriminatory or retaliatory act, and precludes reliance upon a continuing violation theory . . . .

*Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (emphasis original). *Martinez* held that, under *Morgan*, discrete acts of alleged discrimination or retaliation occurring after the plaintiff had filed his charge of discrimination were not actionable when the plaintiff did not file a charge as to those subsequent discrete acts. This Court, relying on *Morgan, Martinez* and *Romero-Ostolaza v. Ridge*, 370 F.Supp. 2d 139, 149 (D.D.C. 2005), held likewise in *Thomas v. The University of South Carolina*, 2006 WL 2521592, *5 (D.S.C. 2006) (copy attached).

*Morgan's* requirement that each alleged discrete act be administratively exhausted applies regardless of whether the act is characterized as one of discrimination or retaliation, or both. As *Coleman-Adebayo v. Leavitt*, 326 F.Supp. 132 (D.D.C. 2004) explains:

The key to determining whether a claim must meet the procedural hurdles of the exhaustion requirement itself, or whether it can piggy-back on another claim that has satisfied those requirements, is whether the claim is of a 'discrete' act of discrimination or retaliation or, instead, of a hostile work environment. 'Discrete acts such as termination, failure to promote, denial or transfer, or refusal to hire' are individual acts that 'occur' at a fixed time. *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. at 114, 122 S.Ct. 2061. Accordingly, Plaintiffs alleging such discriminatory action must exhaust the administrative process regardless of any relationship that

15

may exist between those discrete claims and any others.

> Individual acts of retaliation that form the basis of retaliation claims are also included with the Supreme Court's list of discrete discriminatory acts, and therefore any claim stemming from those acts must be administratively exhausted.  Indeed, the Court's examples were given without regard to the specific discriminatory motivation for the action; it was the type of action that was determinative.  This approach makes sense, for the focus is on whether a court can discern the date of an act's 'occurrence.'  Retaliation is another type of discrimination under Title VII, one that is equivalent to the prohibition on sex and race discrimination[.]

*Coleman-Adebayo*, 326 F.Supp.2d at 137-38.

The Supreme Court's 2007 opinion in *Ledbetter* leaves no doubt that that Court interprets *Morgan* just as have the courts in *Martinez*, *Coleman-Adebayo* and similar cases.  *Ledbetter*'s statement that "*Morgan* is perfectly clear that when an employee alleges 'serial violations,' *i.e.*, a series of actionable wrongs, a timely EEOC charge *must* be filed with respect to *each* discrete alleged violation[,]" __ U.S. at __, 127 S.Ct. at 2175 (emphasis added), could not be more explicit.

Scott only filed one charge of discrimination against the County, and that charge alleged a single discrete act of race discrimination: his not being selected for the Facilities/Construction Manager position.  [P.dep. D.Ex. 7]  Since he did not comply with the procedural prerequisites to suit prescribed by Title VII by filing a charge of discrimination and retaliation concerning his nonselection for promotion to the Building Official position, his claims of race discrimination and retaliation with respect to that position are procedurally barred.

3.    <u>If Scott's claims of race discrimination and retaliation relating to his not being promoted to the position of Building Official were not procedurally barred by his failure to file a charge concerning that discrete act, those claims still fail as a matter of law on the undisputed material facts.</u>

Even if Scott's claims that he was not promoted to Building Official because of his race and because he had filed a charge about not being selected for the F/CM position were not procedurally

barred by his failure to file a charge over that discrete act of alleged discrimination/retaliation, those claims would fail as a matter of law. Assuming that Scott could make out a prima facie case of discrimination and retaliation, he cannot show that the nondiscriminatory, nonretaliatory reasons offered by Deputy Administrator Harold Young for selecting Bruce Spicher, a certified building official then employed by Charleston County, were a pretext for race discrimination and/or retaliation.

The Building Inspection Department is supervised by Deputy Administrator Young who, like Scott, is African-American. [Young dep. 63] Following Mr. Fogle's selection as Facilities/Construction Manager, County Administrator Bill Clark and Mr. Young met with Scott and Harry Wiggins, the senior inspector in the Building Inspection Department, to inform them that Fogle would assume his new duties the day after Labor Day, that the Building Official position would be posted, and that in the meantime, they would be jointly responsible for running the department, with Scott responsible for supervising administrative functions and Wiggins responsible for supervising the department's field operations and inspections. At that meeting, Wiggins, who held certifications in nearly twenty different areas -- including building official -- from the International Code Council, attempted to persuade Messrs. Clark and Young why he should be promoted to succeed Fogle as County Building Official. Scott reacted angrily to Wiggins's effort to make his case, insisting that he was clearly more qualified than Wiggins and that he would never work for Wiggins. While Messrs. Clark and Young found Wiggins's attempt to make a case for promoting him inappropriate to the occasion of their meeting and told him so, they were also disturbed by Mr. Scott's reaction. [P.dep. 42, 58-71; Clark dep. 51-53, 75-76, 81-83; Young dep. 31-37, 44-46, 66-68]

The Building Official position was advertised beginning September 8, 2006. The vacancy announcement set out the job duties and qualifications as follows:

**General Statement of Duties**:
Under the general direction of the Deputy Administrator for Community Development, enforces Local and State laws concerning the construction, alteration and demolition of the buildings and structures, ensures the compliance of all residential and commercial structures with the international building code. Other duties of the Building Official are to organize, plan, coordinate, train, direct, control and review the activities of the personnel in the Building Inspection department. Represents the County in the field of code administration and enforcement.

**Minimum Qualifications**:
Possess a Bachelor's Degree in engineering, architecture, and or a Building Official Certification in the State of South Carolina and five (5) years of experience in a County building inspection department encompassing all aspects of statutory building code review, assessment, permit, compliance, or any equivalent combination of education and experience that provides the required knowledge, skills and abilities. Proficient verbal, written and communication skills. Must have working knowledge of Microsoft Office products, office machines and business procedures. The individual selected will have the ability to apply common sense understanding, judgment and the capacity to make sound and reasonable decisions. Must possess a valid SC driver's license.

[P.dep. D.Ex. 5] Scott and Wiggins both applied as did several outside candidates, including Bruce Spicher, a certified building official who had served as Charleston County's senior codes inspector since 1998. [Young dep. 12-13, 19-20, 24-25; Spicher dep. 20-21 and P.Ex. 3]

Mr. Young interviewed all the applicants and ultimately decided on Mr. Spicher as his first choice. As a result of the way Wiggins and Scott had acted in their meeting with Messrs. Young and Clark to discuss interim management of the Building Inspection Department in the wake of Fogle's move to the F/CM position and as a result of conversations that he had with employees of the Building Inspection Department, Mr. Young concluded that the department would function more

18

effectively with someone from the outside than it would with either Scott or Wiggins heading it. [Young dep. 44-46; 64-66]  Mr. Spicher was a certified building official who had served in a supervisory capacity in the Building Inspection Department of one of the state's largest counties and he came highly recommended.  Mr. Young determined that, as an outsider who was not only a certified building official but had supervisory experience in a large building inspection department, Spicher was the best choice and most qualified candidate for the position.  [Young dep. 37-45; 55-62; 64-66; 83-84]

a.      Race Discrimination

At his deposition, Scott conceded that he has no direct evidence that he was not selected for the Building Official position because of his race or in retaliation for his having filed his charge of discrimination over the F/CM position.  [P.dep. 94, 119-20]  As with his claim of race discrimination relative to the F/CM position, he must therefore rely on the *McDonnell Douglas - Burdine* shifting burdens proof scheme.  *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213-14 (4th Cir.), *cert. denied*, 128 S.Ct. 955 (2008).  While Scott can satisfy the requirements of a prima facie case of race discrimination with respect to the Building Official position, he cannot withstand summary judgment on that claim because he has not identified any evidence that would support a rational finding that the nondiscriminatory explanation given by Mr. Young for selecting Spicher is a pretext for race discrimination.

As earlier discussed, Mr. Young decided to hire Spicher because he was already certified as a building official by the International Code Council, he had been employed since 1998 in Charleston County's much larger building inspection department in a supervisory capacity, and he was an outsider and, therefore, not a party to the in-fighting between Scott and Wiggins nor aligned with either of them. [Young dep. 37-46; 55-62; 64-66; 83-84]  These are all perfectly legitimate and

entirely rational nondiscriminatory reasons.  *See*, *e.g.*, *Hux*, 451 F.3d at 318 ("[A]n employer can

properly take into account factors such as good interpersonal skills and ability to lead a team.")

(internal quotations omitted); *Price v. Thompson* 380 F.3d 209, 215-16 (4th Cir. 2004) (preference

for applicant who is certified is legitimate nondiscriminatory reason for selection).  To avert

summary judgment, Scott must point to evidence that would support a rational finding that Mr.

Young's nondiscriminatory explanation for his selection of Mr. Spicher is a pretext for race

discrimination.  *See Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993); *see also*

*Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278-79 (4th Cir. 2000).  He has not done, and cannot do, so.

Initially, the fact that Mr. Young is himself African-American undermines Scott's claim that

Young did not select him because of his race.  *See Bryant v. Lucent Technologies, Inc.*, 307

F.Supp.2d 726, 743 n. 10 (D.Md.), *aff'd mem.* 112 Fed.Appx. 285 (4th Cir. 2004); *Demesme v.*

*Montgomery County Gov't*, 63 F.Supp.2d 678, 683 (D.Md.), *aff'd mem.* 208 F.3d 208 (4th Cir. 2000);

*Dewitt v. Mecklenburg County*, 73 F.Supp.2d 589, 598-99 (W.D.N.C. 1999).  Moreover, Scott's

contention that his four-year degree demonstrates that he was better qualified than Spicher for the

Building Official position is unavailing.  The job vacancy stated that applicants must have "a

Bachelor's Degree in engineering, architecture, *and or* a Building Official Certification and five (5)

years of experience in a County building inspection department . . . ."  [P.dep. D.Ex. 5 (emphasis

added)]  Spicher had a building official certification (but no bachelor's degree) and eight years of

experience as a senior inspector in the Charleston County's building department [Spicher dep. 20-21

and P.Ex. 3], whereas Scott  had a bachelor's degree in engineering technology (but no building

official certification) and eight years of experience as a commercial plans examiner in the

Orangeburg County Building Inspection Department.  [P.dep. 42; 44, 112; D.Ex. 4]  Title VII does

not require employers to award positions to the applicant with the highest level of education without

regard for other considerations, as Scott seems to think. *See* cases cited *supra*, p. 10  In short, the fact that Scott had a bachelor's degree (but no building official certification) whereas Spicher had a building official certification (but not a bachelor's degree) does nothing to undermine the nondiscriminatory explanation offered by Mr. Young for choosing Spicher. *See Amirmokri*, 60 F.3d at 1130 (affirming summary judgment on failure to promote claim on basis that even if plaintiff's education was superior to selectee's, employer could properly take into account both objective factors where the selectee excelled "and the more subjective factors like his good interpersonal skills and his ability to lead a team.")' *Hux*, 451 F.3d at 315 (Title VII plaintiff cannot show pretext "simply [by] compar[ing] herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination.")

It is evident that Scott has a high regard for his own qualifications.  Indeed, he told Mr. Young that he was one of the most qualified people in the state for the position "and that Young would have to look high and low to find someone more qualified than [Scott] for the building official position."  [P.dep. 95]  Scott's own self-assessment of his relative qualifications for the position of Building Official, though, is irrelevant.  It is Mr. Young's assessment that mattered.  *See Evans v. Technology Applications & Service Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996).

Scott was not only *not* a certified building official when he applied (or now), but he had taken the exam twice and failed it on both occasions.  [P.dep. 42, 44; Young dep. 64-65]  Although state law "grandfathered" Mr. Fogle because he was in office as the County Building Official when the certification requirement took effect, state law mandated that any successor Building Official be certified.  *See* S.C. Code Ann. §§ 6-8-30 and -40.  [P.dep. 36-38; 49; Young dep. 16-19]  While Scott maintains he would have had a two year grace period to pass the test and attain certification if he had been selected as the County's Building Official [P.dep. 112-13], he had already taken and failed the

21

test twice. And, as Mr. Young explained, if he had selected Scott and Scott had not passed the test during the grace period, the County would then have to remove Scott and start the selection process for a Building Official anew. [Young dep. 43-44] So, although Scott was not required to be certified as a building official to *apply* for the position, he would have had to pass the International Code Council's test for certification as a building official to continue in the position, and his track record was not promising.

Scott has adduced no evidence that would support a rational finding that the nondiscriminatory reasons given by Mr. Young for selecting Bruce Spicher for the vacant Building Official position are a pretext for racial discrimination. Absent such evidence, the County is entitled to summary judgment on the claim that Scott was not promoted to this position because of his race.

b.    Retaliation

Mr. Scott's would-be retaliation claim is just as factually unsupported as his would-be discrimination claim is. He has no direct evidence to support his allegation that the County refused to promote him to Building Official because he had filed a charge of discrimination concerning his nonselection for the Facilities/Construction Manager position [P.dep. 119-22], and the circumstantial evidence does not support but, indeed, undermines the claim.

To establish a prima facie case of retaliatory failure to promote, Scott must offer evidence showing (1) that he filed a charge of discrimination with the EEOC, (2) that the County did not promote him, and (3) that the filing of the charge was casually connected the failure to be selected for promotion. *Holland*, 487 F.3d at 218. While Scott can establish the first two elements, his own testimony prevents him from establishing the third.

In his complaint, Scott specifically alleges that the County chose Spicher rather than him to be the Building Official "in direct retaliation of his filing of a complaint with the U.S. EEOC office

in October." [Complaint, ¶ 27]  The sequence of events, though, is not as is alleged in the complaint, as Scott himself acknowledged.

The sequence of events alleged in the complaint is as follows:

> 24.  In October 2006, Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission claiming race discrimination and failure to promote.
>
> 25.  Shortly thereafter, Plaintiff was told by Harold Young that Bill Clark did not want his application for Building Official and that he was not going to hire him.
>
> 26.  Plaintiff did not receive the job.  In fact, Defendant violated its policy regarding upward mobility and promotions and went outside the agency and hired a white male, Bruce Spicher, from Charleston County.
>
> 27.  Plaintiff believes that Spicher was hired in direct retaliation of his filing of a complaint with the U.S. EEOC in October.

[Complaint, ¶¶ 24-27]  In his deposition testimony, Scott explained that the sequence of events was actually that Harold Young told him that Mr. Clark did not want his application and that he (Young) would not hire him as the Building Official on October 4, 2006, which was eight days *before* Scott filed his charge of discrimination.  [P.dep. 106-10; 114-15; D.Ex. 7]  The charge of discrimination was signed by Scott on October 11, 2006 and mailed to the EEOC via next day mail that same day. It was received by the EEOC and filed on October 12, 2006 and mailed to the County that day.  The County first received the charge on October 16, 2006.  [P.dep. 79-81, 99-101, 132-33, D.Ex. 7; Clark dep. 10-11, 76-80, 84-85, D.Ex. 6]  Yet, Scott testified that Mr. Young told him on October 4, 2006 that County Administrator Bill Clark did not want his (Scott's) application for Building Official position and that he (Mr. Young) was not going to do anything to help Scott.[6]  Scott was adamant

---

[6]Both Messrs. Young and Clark deny the comments attributed to them.  [Young dep. 21-22, 52, 62-63, 80; Clark dep. 83-84]

that this conversation with Mr. Young on October 4, 2006, occurred the same day that he hand-delivered his application for the position to Human Resources Director Marion Boyd. [P.dep. 106-10, 114-15, D.Ex. 10]

Scott's claim is that he was not promoted to Building Official in November 2006 because he filed a charge of discrimination in October 2006. But, he had not filed a charge on October 4, 2006, when he says Mr. Young made the comments about Mr. Clark not wanting his application for that position. In fact, Scott testified, he submitted his application -- which is dated October 4, 2006 -- right *after* Mr. Young allegedly told him that Clark did not want an application from him and Young would not hire (or help) him. [P.dep. 106-09, 114-15] Further, Mr. Clark testified that he had no knowledge that Scott had filed a charge or was involved with the EEOC until October 16, 2006, the date that the County received the charge from the EEOC. [Clark dep. 10-11, 76-80, 84-85, D.Ex. 6]

Thus, according to Scott himself, Messrs. Young and Clark had declared him out of contention for the Building Official position a week before he filed a charge and two weeks before the County learned of the charge. Obviously, Clark and Young could not retaliate against Scott for the filing of a charge that had not yet been filed, *see Horne v. Reznick Fedder & Silverman*, 154 Fed.Appx. 361, 364 (4th Cir. 2005); *McLee v. Chrysler Corp.*, 109 F.3d 130, 136 (2d Cir. 1997); *Hindman v. Greenville Hosp. System*, 947 F.Supp. 215, 224-25 (D.S.C.), *aff'd mem.* 133 F.3d 915 (4th Cir. 1997), and/or of which they had no knowledge. *See Holland*, 487 F.3d at 218; *Causey v. Balog*, 162 F.3d 795, 802-03 (4th Cir. 1998). Therefore, Scott cannot establish a prima facie case because he cannot establish a nexus between the alleged protected activity -- his filing of a charge -- and his failure to be selected as Building Official.

24

Even assuming that Scott could disavow his own sworn testimony that had been told that he was out of contention for the Building Official vacancy more than a week before he filed his charge of discrimination and nearly two weeks before the County knew about it, *but see Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984); *Halperin v. Abacus Technology*, 128 F.3d 191, 198 (4th Cir. 1997), he still has not shown that the nonretaliatory reasons that Mr. Young gave for selecting Spicher are a pretext for unlawful retaliation.  As explained in Argument 3a, the reasons that Mr. Young gave for selecting Spicher are entirely legitimate, rational and nonretaliatory.  Since Scott has not come forward with any evidence that these were not Mr. Young's true reasons and that retaliation motivated his decision, the County is entitled to summary judgment.  *Holland*, 487 F.3d at 218.

4.    <u>Scott's claim for breach of contract fails as a matter of law on the undisputed material facts because the ordinance on which he relies does not constitute a contractual entitlement and, even if it does, the County did not breach that "contract."</u>

In his third cause of action, Scott purports to state a pendent claim for breach of contract. He alleges that the County's selection of Mr. Spicher to succeed Mr. Fogle as County Building Official violated County policy providing that, in filling advertised vacancies, the County must consider qualified internal applicants before considering applicants not employed by the County. [Complaint, ¶ 30]  This claim fails as a matter of law for at least two reasons:  (1) the referenced policy appears only in County's Personnel Ordinance and, under settled South Carolina law, ordinances do not give rise to contractual entitlements; and (2) the County complied with the referenced ordinance, so even if the ordinance did give rise to a contractual entitlement, no breach occurred.

The policy to which Scott refers is part of a County ordinance that is found in Division 8 of the Code of Ordinances of Orangeburg County, South Carolina.  Division 8 of the Code is captioned "Personnel Policy," and the particular section within Division 8 of the Code relied on by Scott, § 2-

343(c), captioned "Promotion and Transfers", provides:

> (1)    In order to provide upward mobility for the employees in county service, it shall be the policy of the county to consider applications from persons currently employed before applications from the public are considered. A notice will be posted on the bulletin board for each vacancy that occurs stating the position, the minimum training and experience requirements, the salary range, and how and when to apply.

> (2)    First consideration shall be given to those persons in the unit or department where the vacancy occurs for whom the vacant position would represent a promotion. If none of these persons are selected to fill the vacancy, all other county employees requesting consideration will be considered. Finally, any other applications may be considered.

Orangeburg County Code of Ordinances, § 2-343(c)(1) and (2) [Clark dep. D.Ex. 7, p. CD2:35][7]

a.    <u>Section 2-343(c) does not give rise to any contractually enforceable rights.</u>

A plaintiff alleging a claim for breach of contract bears the burden of establishing the existence of the contract that he alleges. *Prescott v. Farmers Tel. Co-op., Inc.*, 516 S.E.2d 923, 926 (S.C. 1999); *Abraham v. Palmetto Unified Sch. Dist.*, 538 S.E.2d 656, 660-61 (S.C. Ct. App. 2000) This poses an immediate and insurmountable problem for Scott because there is a presumption that statutes and ordinances, especially those relating to the terms and conditions of public employment, do not create contractual rights. *Alston v. City of Camden*, 471 S.E.2d 174, 177-78 (S.C. 1996). *Alston* adopted the United States Supreme Court's view that

> absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise. This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Policies, unlike

---

[7]Scott confirmed that his breach of contract claim rested entirely on § 2-343(c). [P. dep. 118-19]

> contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body.

*National R. R. Passenger Corp. v. Atchison, Topeka, & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985), *quoted in Alston*, 471 S.E.2d at 178.

As was true of the personnel ordinance in *Alston*, examination of the County's personnel ordinance discloses *no* intent, much less the required clear and unequivocal intent, to bind the County contractually to the "first consideration" policy. The expressed purpose of the Personnel Policy division of the Code within which the "first consideration" provision is found, is "to establish a consistent personnel *policy* for the county and to establish *guidelines* governing employees of the county." Orangeburg County Code of Ordinances, § 2-231 [Clark dep. D.Ex. 7, p. CD2:30 (emphasis added)]. This stated purpose is incompatible with Scott's claim that the personnel ordinance gives rise to contractual rights. *See Alston*, 471 S.E.2d at 178 (where stated purpose of personnel ordinance was "to establish a standardized personnel system and to implement the system as efficiently as possible[,]" purpose "simply express[ed] City's *policy* intention to have a uniform system[,]" not to create contract rights (emphasis original)). Further, the fact that § 2-343 uses mandatory language (*e.g.*, "First consideration shall be given . . . .") does not support Scott's claim of a contractual entitlement. As *Alston* explained in rejecting this argument:

> First, the mandatory language is just as consistent with an intent to have a uniform policy as with an intent to enter into contracts. Second, many statutes and ordinances contain mandatory language; that fact alone is not particularly indicative of an intent to enter into contractual relations with anyone.

*Id.*, 471 S.E.2d at 178.

In addition to the presumption *against* reading ordinances as contracts, the Code is explicit that Division 8 -- the Personnel Policy -- does not create any contractual rights. The initial section

of Division 8, captioned "Purpose", provides:

> *This division [i.e., Division 8] shall describe the county's general philosophy concerning policies and procedures and shall in no way form a contract between the employees and the county.* The provisions of this division are subject to change at any time upon being amended by ordinance of the county council. Furthermore, notwithstanding any of the provisions of this division, all employees of the county are employees-at-will who may quit at any time for any or no reason and who may be terminated at any time for any or no reason.

Orangeburg County Code of Ordinances, § 2-231. [Clark dep. D.Ex. 7, p. CD2:30 (emphasis added)]  So, the County personnel ordinance itself leaves no doubt that it does not create contractually enforceable rights.  A court simply cannot construe a statute as creating contract rights when that statute expressly states that it is *not* contractual in nature and is *not* to be so construed. *See Hodges v. Rainey*, 533 S.E.2d 578, 581-82 (S.C. 2000); *Paschal v. State Election Commission*, 454 S.E.2d 890 (S.C. 1995) (courts are to construe statutes as written and cannot distort, contort or disregard express language of the statute).

In sum, since the presumption that ordinances do not create contract rights is, in this case, expressly confirmed by the language of the personnel ordinance itself, Scott's claim for breach of contract arising out of the County's alleged failure to comply with the "first consideration" policy set forth in § 2-343 fails as a matter of law.  *See Alston*, 471 S.E.2d at 177-79 (impairment of obligation of contract claim based on repeal of ordinances setting forth employee fringe benefits and adoption of new ordinance vesting city manager with power to prescribe benefits failed as a matter of law because former ordinances were not enforceable as contracts); *Abraham*, 538 S.E.2d at 660-61 (summary judgment properly entered against teachers' claim that state agency's violation of their statutory rights regarding minimum salary requirements, twelve-month schedule, and annual leave accrual constituted breach of contract because none of statutes evidenced intent to create contractual

rights).

b.    Even if § 2-343(c) created a contract right to "first consideration", the County did not breach the alleged contract.

Even if the "first consideration" provision of the County's personnel ordinance were enforceable as a contract right, Scott still could not withstand summary judgment on his pendent claim.  In an action for breach of contract, the plaintiff not only bears the burden of proving the contract, he also bears the burden of proving that that contract was breached.  *Volvo Trucks & Equipment, Inc. v. Volvo Trucks of N. America, Inc.*, 492 F.3d 484, 494 (4th Cir. 2007), *citing Fuller v. Eastern Fire & Casualty Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962).  Scott cannot prove this essential element of his claim.

The "first consideration" language of the personnel ordinance requires the County to "consider applications from persons currently employed before applications from the public are considered."  The ordinance further provides that "[f]irst consideration shall be given to those [applicants] in the unit or department where the vacancy occurs for whom the vacant position would represent a promotion[;]" that if none of those applicants is selected, then consideration must next be given to "all other county employees" who have applied; and that if none of those applicants is selected, "any other applications may be considered."  Orangeburg County Code of Ordinances § 2-343(c)(1) and (2) [Clark dep. D.Ex. 7, p. CD 2:35]  While the ordinance directs that applications be "considered" according to this scheme, it does not purport to dictate the ultimate selection.  Instead, the ordinance provides:  "The final selection of the person to fill each vacancy [under the authority of the county administrator] shall be made by the appropriate . . . department head with the approval of the county administrator."  § 2-343(d), *id.*

In this case, it is undisputed that Scott was considered for the position of Building Official before Bruce Spicher was ultimately selected.  Scott himself testified that Deputy Administrator

29

Harold Young had told him that the Building Official position would likely be filled by him or Harry Wiggins, another inspector in the Department and "may the best man win." [P. dep. 61] While Scott testified that he was offended by the fact that Young apparently did not consider him (Scott) to be clearly superior to Wiggins because of his four-year degree and greater length of County service, he also acknowledged that Wiggins was already certified as a Building Official whereas he was not, having twice taken and twice failed the test. [P.dep. 42, 44, 61-71; 112] Mr. Young testified that he did consider both internal applicants -- Scott and Wiggins -- but that he ultimately decided, upon consideration of the behavior they displayed during their meeting with him and County Administrator Clark and after talking with employees in the department, that the department would likely function more effectively if neither Scott nor Wiggins were in charge. [Young dep. 31-46; 55-69; 78-79; 81-83] Indeed, Marian Miller, the senior permitting clerk in the department, testified that when Mr. Young told her that Scott and Wiggins had applied and asked her what she thought, she told Mr. Young that she thought the department would function better if he selected an applicant from outside the department. [Miller dep. 6; 21-24]

While it is undeniable that neither of the internal applicants -- Scott and Wiggins -- were selected to fill the Building Official position that opened up when Fogle was moved to the new Facilities/Construction Manager position, both were considered for the job *before* Mr. Young decided to select an applicant from outside the County. "First consideration" is what they received, and that is all that they were entitled to under § 2-343(c).

Therefore, even if the "first consideration" provision were enforceable as a contract, Scott's claim fails as a matter of law because the County did not breach that provision when it hired Mr. Spicher, someone who did not work in the department or work for the County. For this additional reason, the breach of contract claim cannot withstand summary judgment. *See Celotex Corp. v.*

30

*Catrett*, 477 U.S. 317, 322-23 (1986) (summary judgment required where plaintiff fails to offer proof of essential element of his claim); *see also Holden v. Alice Mfg. Inc.*, 452 S.E.2d 628 (S.C. Ct.App. 1994) (summary judgment appropriate where terminated employee failed to prove that employer violated its policies in laying him off).

<u>Conclusion</u>

For all the foregoing reasons, the County requests that the Court grant its motion for summary judgment.

   s/Vance J. Bettis
VANCE J. BETTIS (FID 1323)
GIGNILLIAT, SAVITZ & BETTIS, L.L.P.
900 Elmwood Ave., Suite 100
Columbia, SC   29201
Phone:  (803) 799-9311 / Fax:  (803) 254-6951
vbettis@gsblaw.net

ATTORNEY FOR DEFENDANT

October 31, 2008
SJ Mem-484.P-BRF-vjb.wpd